IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HEIDI SURMAN, | |
| Plaintiff, | Civil Action No. |
| v. | Judge |
| UPMC PRESBYTERIAN SHADYSIDE (UPMC) AND UPMC d/b/a UNIVERSITY OF PITTSBURGH MEDICAL CENTER (UPMC) | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT

Plaintiff Heidi Surman brings this action for discrimination in employment and retaliation for opposing that discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S §§ 951 *et seq.*, against her former employer UPMC d/b/a University of Pittsburgh Medical Center ("UPMC") and UPMC Presbyterian Shadyside ("UPMC").

UPMC is a non-profit healthcare provider and insurer headquartered in Pittsburgh, Pennsylvania. The largest non-governmental employer in Pennsylvania, with 65,000 employees, UPMC reported assets of $11.5 billion in 2016. UPMC Presbyterian Shadyside is UPMC's flagship hospital, and as of the second quarter of 2016 was identified by the Pennsylvania Department of Labor and Industry as the single largest employer in Allegheny County.

## JURISDICTION AND VENUE

1. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a) for the claims brought under Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e *et seq*, and under the doctrines of pendant and supplemental jurisdiction for her claims under the PHRA.

2.  The United States District Court for the Western District of Pennsylvania has personal jurisdiction over Defendants as they are located and conduct business within this District.

3.  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), inasmuch as Defendants have offices, conduct business, and are located in the Western District of Pennsylvania, and these causes of action arose and occurred in the Western District of Pennsylvania.

## PARTIES

4.  Ms. Surman is an adult female residing in Allegheny County, Pennsylvania.

5.  Defendants are non-profit corporations, or other legal entities, organized under the laws of Pennsylvania. UPMC's address is listed with the Department of State as 200 Lothrop Street, Pittsburgh, PA 15213. UPMC Presbyterian Shadyside's address is listed with the Pennsylvania Department of State as Desoto at O'Hara Streets, Pittsburgh, PA 15213. UPMC Presbyterian Shadyside has listed its address in EEOC filings in this case as 600 Grant Street, 57th Floor, Pittsburgh, PA 15219. At all relevant times, each Defendant was an "employer" within the meaning of Title VII, and the PHRA.

## FACTUAL ALLEGATIONS

6.  Ms. Surman began working for Defendants on or about July 15, 1997. During the course of her employment, Defendants promoted Ms. Surman to the positions of Systems Analyst, Operations System Engineer, Project Manager, Associate Director, and finally, in

December 2012, to Director of Enterprise Technology Services, her final position in the company.

7. In both 2012 and 2013, Ms. Surman received the highest possible rating from her supervisor, Jeff Szymanski, UPMC's then-Vice President ("VP") of Enterprise Technology Services. Ms. Surman's exceptional ratings were approved by VP Szymanski's supervisor, Christian Carmody, UPMC's Senior Vice President ("SVP") for the Information Services Division ("ISD").

8. Beginning in approximately late 2011, Ms. Surman's job responsibilities required her to interact with Iftekhar Kazi, UPMC's Vice President of Enterprise Technology Infrastructure, who also reported to SVP Carmody. VP Kazi's position was equal in authority to VP Szymanski's.

9. VP Kazi was well known for mistreating women – particularly outspoken women – and favoring men on his team. For example, in mid-2013, VP Kazi informed a female manager in his group, Lori Stelter, that her position was no longer necessary. Ms. Stelter ultimately found herself in Ms. Surman's group, where, during one of their regular check ins, Ms. Stelter told Ms. Surman that she had been pushed out of VP Kazi's group because she wasn't part of the "good ole boys" club. Shortly thereafter, VP Kazi recreated the manager position formerly occupied by Ms. Stelter and placed his brother-in-law in the role he had claimed was no longer necessary when it was occupied by a woman.

10. In mid-2013, SVP Carmody transferred responsibility for the ITSM "tools team" from VP Kazi to VP Szymanski so that Ms. Surman could address problems the team was having with a key asset management program, HP Service Manager. Ms. Surman was quickly able to accomplish this goal, negotiating the free tech support and customization required to ensure the program's proper functioning.

3

11.     In approximately November 2013, VP Kazi called Ms. Surman into his office for a one-on-one meeting which lasted approximately one hour.  During the meeting, VP Kazi ridiculed Ms. Surman and her team, calling her and VP Szymanski "invisible leaders," attacking her direct report Wendy Shaffer and others on Ms. Surman's team. VP Kazi then insisted that Ms. Surman should report to him on a "dotted line" basis for the ITSM Tools Team, the same team that had been removed from VP Kazi's oversight a few months earlier so that Ms. Surman could address the challenges with HP Service Manager.

12.     Ms. Surman stood up for herself, her supervisor and the other members of her team, pushing back against VP Kazi's efforts to intimidate her and noting that the team under her leadership had made more progress with HP Service Manager than ever before.

13.     In response, VP Kazi warned Ms. Surman that it would get back to him if she reported their conversation to VP Szymanski, and noted that if she did so she would face the same fate as "Sarah," another female UPMC employee against whom VP Kazi retaliated after she "crossed" him.

14.     Subsequently, VP Kazi held a similar private meeting with Ms. Surman's direct report Wendy Shaffer. During this meeting he again attacked Ms. Surman's team, but reserved his most significant hostility for Ms. Surman herself, calling only Ms. Surman an "invisible leader" and telling Ms. Shaffer that he and VP Symanski were friends who dined together regularly.

15.     Ms. Surman already knew of VP Kazi's reputation for mistreating assertive women. Nevertheless, Ms. Surman immediately reported VP Kazi's derisive and threatening behavior to her immediate supervisor, VP Szymanski, who told her that he would address the matter and would involve his supervisor, SVP Carmody.

16. On subsequent occasions Ms. Surman reported VP Kazi's discriminatory and retaliatory behavior to SVP Carmody. During one face-to-face conversation in his office with Ms. Surman and Ms. Shaffer, who had come to raise again their concerns about VP Kazi's conduct toward them, SVP Carmody leaned back in his chair, put his feet up on his desk, crossed his arms, and said, "Well, I guess I'll just have to go and tell Ifte to back the fuck off." Mr. Carmody's posture and tone lead Ms. Surman to feel as though Mr. Carmody was angry with her for following up on her previous complaint and was implicitly telling her he wasn't really going to do anything to effectively resolve them.

17. To Ms. Surman's knowledge, neither of the supervisors reported her complaints to HR. Instead, one or both of them informed VP Kazi of Ms. Surman's complaint.

18. As promised, VP Kazi responded by embarking on a campaign of retaliation against Ms. Surman. He refused to communicate with her and her team, despite the fact that her job responsibilities, and those of her group, entailed working with VP Kazi's group, particularly on asset management. When Ms. Surman or her team members would seek critical information from VP Kazi's team, VP Kazi himself would often personally respond by refusing to provide that information.

19. Ms. Surman repeatedly asked VP Kazi to schedule meetings and work sessions which included her. He rebuffed all these requests.

20. Ms. Surman also offered to appoint someone from her group to serve as a liaison between herself and VP Kazi so that the required work could move forward. VP Kazi refused.

21. Despite, Ms. Surman's continued complaints to VP Szymanski and SVP Carmody concerning VP Kazi's ongoing retaliation against her, no investigation was undertaken. Neither Ms. Surman's supervisors nor anyone else associated with Defendants took any effective action against VP Kazi, and his retaliation against Ms. Surman continued unabated.

22. In approximately June of 2014, an outside vendor told Ms. Surman that all positions in VP Szymanski's group, including hers, were being put up for bid and that they would be moved under VP Kazi's authority.

23. Because VP Kazi had continued his retaliatory behaviors despite the complaints she made to her supervisors, and Ms. Surman feared that his behavior would only worsen if the vendor's information were true, she contacted HR.

24. HR representative, Jacquie Demianczyk, confirmed that the vendor's information was true. Ms. Surman expressed her concerns about VP Kazi to Ms. Demianczyk, noting that her supervisors had taken no actions in response to her reports of VP Kazi's discriminatory and retaliatory conduct toward Ms. Surman and others. Ms. Surman asked what steps UPMC would take to ensure that Ms. Surman and other women on her team would be protected from mistreatment if they were placed on VP Kazi's team.

25. As Ms. Surman was about to leave on a long-planned vacation to Europe, she asked whether she should cancel the vacation in order to be present to bid on her job. Ms. Demianczyk assured her she would have an additional two days after she returned to bid on her Director position or another Director position within VP Kazi's group.

26. Upon Ms. Surman's return from her vacation, Ms. Demianczyk informed her that things had changed: VP Kazi had decided to fill the positions himself without using the bidding process, and all seven of VP Kazi's Director positions had already been offered to men.

27. Defendants offered Ms. Surman the position of Print Director in the Finance Group, a position which would have removed her from the ISD work she had been doing and all of her reports. However, when Ms. Surman inquired about the details of the role, no one in the Finance Group or in HR could tell her what the job duties and responsibilities of the position

would be or why this position was being created. When Ms. Surman requested a written description of the Print Director role and responsibilities, she was told that none existed.

28. When Ms. Surman spoke to her former supervisor, VP Szymanski, about the Print Director position, he advised her not to take it. Since there were no real duties attached to the position, he indicated she would probably be laid off for lack of work during the next reorganization. Ms. Surman did not take the position, reasonably believing the position was, in reality, an interim step in UPMC's retaliatory plan to terminate her employment.

29. While Defendants eventually permitted Ms. Surman to bid on a handful of Director level positions outside the ISD group, which had been posted, all but one of those positions were pulled a short time after Ms. Surman made application. Ms. Surman interviewed for the one remaining position opening, but Ms. Demianczyk informed her she not chosen for the position at the time she informed Ms. Surman that she was being terminated.

30. While Ms. Surman was searching for a new position with Defendants, she learned that Cheryl Paxton-Hughes, the wife of one of VP Kazi's newly selected male Directors, would be taking on a Director role herself under VP Kazi. Ms. Paxton-Hughes, unlike Ms. Surman, had no prior ITSM experience.

31. Ms. Paxton-Hughes' lack of relevant knowledge was evident from the moment she assumed her new role, and she turned to Ms. Surman for assistance with myriad questions concerning the basic aspects of her job duties.

32. On or about August 11, 2014, Defendants terminated Ms. Surman.

33. One day before Defendants terminated her, HR finally responded to Ms. Surman's repeated requests for an update on the status of her complaint of discrimination. Defendants HR Director, Eric McIntosh, told her he did not believe discrimination occurred and

that he considered the matter closed. He did not provide any specific rationale for his conclusion.

34. As a result of Defendants' discriminatory and retaliatory actions, Ms. Surman, the sole support of her family, has suffered humiliation and embarrassment, lost her job, most of her income as well as the benefits and emoluments of her employment, and her house. She has incurred medical bills, has incurred interest and other expenses and losses, and has been subjected to great emotional distress and anxiety.

## COUNT I

### (Sex Discrimination under Title VII and the PHRA)

35. Ms. Surman incorporates the preceding paragraphs as if set forth fully herein.

36. Through the above-described conduct, Defendants intentionally violated Ms. Surman's right to be free from sexual discrimination in employment under Title VII and the PHRA.

37. Ms. Surman dual filed timely charges of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission more than one year ago and has received notification of her right to sue from the EEOC. She has exhausted all administrative remedies under Title VII and the PHRA.

**WHEREFORE**, Ms. Surman seeks the following relief:

A. A declaratory judgment that the practices complained of herein are unlawful under Title VII and the PHRA;

B. Back pay, front pay and other damages in the form of lost wages, lost or reduced benefits, and prejudgment interest to the fullest extent permitted under the law;

    C.    Compensatory, liquidated and punitive damages to the fullest extent permitted under the law;

    D.    Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

    E.    Such other and further relief as this Court deems just and proper.

## COUNT II

### (Retaliation under Title VII and the PHRA)

38.    The foregoing paragraphs are incorporated by reference.

39.    As described, Ms. Surman engaged in the protected activities of opposing Defendants' discriminatory acts made unlawful by Title VII and the PHRA by reporting VP Kazi's discriminatory and retaliatory conduct to her supervisors and Defendants' HR department. Defendants took the above-described adverse actions against her by subjecting her to a continuous retaliation and terminating her in violation of her rights under Title VII and the PHRA.

40.    As VP Kazi predicted they would, Defendants permitted him to successfully retaliate against Ms. Surman for opposing his sexually discriminatory statements and attacks on her by reporting them to her supervisors despite his threats.

41.    Plaintiff has exhausted all prerequisite administrative remedies.

**WHEREFORE**, Plaintiff seeks the following relief:

    A.    A declaratory judgment that the practices complained of herein are unlawful under Title VII and the PHRA;

    B.    Back pay, front pay and other damages in the form of lost wages, lost or reduced benefits, and prejudgment interest to the fullest extent permitted under the law;

C. Compensatory, liquidated and punitive damages to the fullest extent permitted under the law;

D. Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

E. Such other and further relief as this Court deems just and proper;

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial as to all claims so triable.

Date: February 7, 2017

s/ Edward J. Feinstein
Edward J. Feinstein (PA I.D. No. 27918)
efeinstein@fdpklaw.com
Deborah Marcuse (PA I.D. No. 322354)
dmarcuse@fdpklaw.com
Feinstein Doyle Payne & Kravec, LLC
429 Fourth Avenue
Law and Finance Building, Suite 1300
Pittsburgh, PA 15219
Tel: (412) 281-8400
Fax: (412) 281-1007

/s/ Justin T. Papciak
Justin T. Papciak (PA I.D. No. 307898)
jtpapciak@morellalaw.com
Jeffery J. Morella (PA I.D. No. 51329)
jjmorella@morellalaw.com
Morella & Associates
706 Rochester Road
Pittsburgh, PA 15237
Tel: (412) 369-9696
Fax: (412) 396-9990

*Attorneys for Plaintiff*