**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

HEIDI SURMAN,                            )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )        Civ. A. No. 17-184
                                         )        Judge Nora Barry Fischer
                                         )
UPMC PRESBYTERIAN SHADYSIDE              )
(UPMC),                                  )
                                         )
                    Defendant.           )

## MEMORANDUM OPINION

## I.      INTRODUCTION

In this employment discrimination case, Plaintiff Heidi Surman ("Plaintiff") challenges her termination via a reduction in force asserting that she was subject to gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. ANN. §§ 951 *et seq.* (Docket No. 1). Presently before the Court are Defendant UPMC Presbyterian Shadyside's ("Defendant" or "UPMC") Motion for Summary Judgment, (Docket Nos. 73-76); Plaintiff's opposition thereto, (Docket Nos. 78-81, 88); Defendant's reply, (Docket Nos. 91-96); and Plaintiff's sur-reply, (Docket Nos. 99-102). The matter has been fully briefed. Having carefully considered the parties' positions and having evaluated the evidence in light of the appropriate standard governing motions for summary judgment, and for the following reasons, UPMC's motion [73] is denied.

## II.     FACTUAL BACKGROUND

In 1996, Plaintiff received an Associate of Science Degree in Information Technology Management from the ICM School of Business & Technology. (Docket No. 94 at ¶ 1). In 1997,

1

UPMC hired Plaintiff as a computer operator for their Information Services Division ("ISD") to perform routine day-to-day tasks in the data center. (Docket No. 92 at ¶ 1). Plaintiff earned her Information Technology Infrastructure Library ("ITIL") certification in 2000. (Docket No. 101 at ¶ 3). Plaintiff also became iOS certified on IBM's operating system in 2000. (*Id.* at ¶ 4).

Plaintiff was promoted several times throughout her almost twenty-year career with UPMC. (Docket No. 92 at ¶ 2). By 2011, she was the Associate Director heading the entire Print Center and was promoted to Director in 2012. (*Id.* at ¶ 8). Plaintiff was ultimately promoted to Director of Enterprise Technology Services ("ETS"). (Docket Nos. 92 at ¶ 2; 101 at ¶¶ 5, 15). As the Director of ETS, she was responsible for Information Technology Services Management ("ITSM"), performing incident management and tracking changes to anything with a technology component, such as servers, networks, and applications. (Docket No. 94 at ¶ 6). Her other responsibilities included: request management, configuration management, and asset management. (*Id.*) The parties disagree as to whether she was also responsible for software management.

Ifthekar Kazi, around whose actions this case centers, was the Vice President of Enterprise Technology Infrastructure for UPMC. (Docket No. 92 at ¶ 26). Holding a similar position at UPMC was Jeff Szymanski, the Vice President for ETS. (Docket No. 92 at ¶¶ 5, 143). Both Szymanski and Kazi reported directly to Christopher Carmody, who was the Senior Vice President for ETS and President of Clinical Connect Health Information Exchange. (Docket Nos. 92 at ¶ 17, 18; 101 at ¶ 13). In the fall of 2013, Plaintiff's team, including Wendy Shaffer, was tasked to work with Kazi's Team to inventory all of the computer hardware assets within UPMC. (Docket Nos. 92 at ¶ 23; 94 at ¶ 17).

In November 2013, Kazi called Plaintiff into his office for an hour-long meeting and told her that she had done nothing well on the project, that she was an "invisible leader", and that Kazi was going to inform Carmody that she had done a poor job. (Docket No. 81-1 at pp. 157, 169; 101 at ¶¶ 19-20). During the conversation, Kazi suggested that Plaintiff report directly to him, an offer which Plaintiff respectfully declined. (Docket No. 81-1 at p. 155). Kazi then warned Plaintiff that if anyone were to learn of their conversation, he would treat her like Sarah Kassimer, which Plaintiff interpreted as meaning that Kazi would ignore her. (Docket No. 81-1 at pp. 155-56).

Plaintiff immediately relayed what had transpired to Szymanski. (*Id.* at p. 158). Afterwards, Kazi apologized but still threatened to tell Carmody that Plaintiff was an invisible leader. (*Id.* at p. 159). Kazi then proceeded to ignore Plaintiff and refused to respond even to her work-related emails. (*Id.* at pp. 159-62). Despite the growing tension, the two teams continued to work together.

In a December 5, 2013 email, Kazi complained to Szymanski about Shaffer as follows:

> [Shaffer] apparently does not get it. . . . She does not want to listen nor has any comprehension of technology, risks and its limitations. . . . Do not mean to ruin your peace time, but she needs reigned in. She has not delivered anything we have requested, never commits to anything, and then instigates and alleges. Your help in this matter would be appreciated. Thanks dude.

(Docket No. 81-9).

According to Shaffer, the women on Plaintiff's team—Plaintiff, Kassimer, Shaffer, and Mary Gallagher—"all talked about" how Kazi treated women differently. (Docket No. 101 at ¶ 39). In March 2014, Shaffer and Plaintiff took their concerns about Kazi's behavior to Carmody. (Docket No. 101 at ¶ 48). They told Carmody that they could not get their jobs done because Kazi would not allow them. (Docket No. 101 at ¶ 50). Carmody responded to Plaintiff and Shaffer's complaints by laughing and saying, "I'll tell Iftekhar to back the eff off. . . ." (*Id.* at ¶ 51).

Starting in March 2014, and continuing into April 2014, Carmody became less responsive to Plaintiff's and Shaffer's concerns and became less responsive to issues relating to their assignments as well. (Docket Nos. 81-2 at ¶¶ 19-20; 101 at ¶ 52). According to Plaintiff, Human Resources ("HR") also began to ignore her concerns. (Docket No. 81-1 at pp. 244-45).

All parties agree that Kazi's Team and Szymanski's Team did not work well together and, ultimately, stopped working together due to strong differences in opinion. (Docket No. 92 at ¶¶ 28, 43). In May 2014, Carmody asked Cheryl Paxton-Hughes, Associate Director of ISD Outreach, to take part of Plaintiff's responsibilities because he had been impressed with Paxton-Hughes' work and less so with Plaintiff's. (Docket Nos. 79 at 180; 92 at ¶¶ 134-38).

At some point, UPMC's ISD decided that it needed to undergo a reorganization in order to cut spending. In a May 30, 2014 email, UPMC described the need to identify those who would be Vice Presidents after the reorganization and would "be responsible for validating the rest of the organizational structure designed by the senior leadership group, and [would] be tasked with executing the strategy to further realign management resources to the demands of the business on ISD." (Docket No. 102-7).

Before it was announced to the public, Carmody told a Hewlett Packard vendor that there was going to be an ISD reorganization. (Docket No. 101 at ¶ 77). Plaintiff learned of the impending ISD reorganization in June 2014, from that same vendor; the vendor also divulged that every ISD director and manager would have to reapply for their positions and that Szymanski's position would be downgraded. (Docket Nos. 76 at pp. 53-54; 92 at ¶ 78). Upon learning this, Plaintiff contacted HR Manager Jacqueline Demianczyk who confirmed that the reorganization was going to occur and that Plaintiff would need to apply for a position under Kazi. (Docket Nos. 92 at ¶ 79; 101 at ¶¶ 14, 79). Demianczyk assured Plaintiff that she would be able to apply for any

director position after she returned from her already-scheduled vacation. (Docket No. 92 at ¶¶ 83-84).

As part of the same conversation, Plaintiff expressed her concern that she would not be treated fairly if Kazi were her supervisor. (Docket No. 101 at ¶ 82-83). Her concern stemmed from the November 2013 "invisible leader" interaction, the fact that Shaffer was having similar issues, and her belief that Kazi had difficulty with strong women. (*Id.* at ¶ 82). Before concluding their conversation, Plaintiff requested that she be allowed to continue the conversation at a later date and asked what steps UPMC would be willing to take to ensure that women working with Kazi would be treated fairly. (*Id.* at ¶ 83).

Plaintiff sent a follow-up email to Eric McIntosh, the Vice President of HR, describing her encounters with Kazi, his similar negative treatment of Lori Stelter and Shaffer, and speculating that the reason Kazi has no women on his team was because he did not respect strong females. (Docket Nos. 81-4 at p. 3; 101 at ¶ 14).

At the time of the reorganization, all Directors who reported to Kazi were men. (Docket No. 101 at ¶ 12). Plaintiff believed that this was not a mistake given his distaste for strong women and told McIntosh and Demianczyk so. (*Id.* at ¶ 85). Demianczyk assured Plaintiff that her allegations would be investigated. (*Id.* at ¶ 88).

Szymanski and Kazi testified that Plaintiff, Shaffer, and Kassimer all complained to HR about Kazi. (Docket No. 101 at ¶¶ 90-91). Although it is not clear from the record when UPMC opened an investigation into Plaintiff's grievance, it ultimately found that there was no evidence of discrimination. (Docket No. 92 at ¶ 116). After obtaining various written statements and conducting interviews, HR determined that Kazi was equally disparaging to both men and women. (*Id.*) At the time of the investigation, UPMC had no written guidelines for conducting HR

5

investigations. (Docket No. 101 at ¶ 108). Demianczyk admitted that she did not follow best practices when she failed to take any notes during her interview with Carmody and when she did not do a write-up summarizing the investigation and its findings. (Docket No. 101 at ¶¶ 109, 112).

Based on his discussion with Carmody, McIntosh testified that Carmody, in referring to Plaintiff and Shaffer, "was aware of their lack of performance" on the joint team project. (Docket No. 101 at ¶ 106). Specifically, McIntosh testified that "[Kazi] wasn't pleased with the performance" and "[Carmody] agreed that the performance was not appropriate on those projects." (*Id.*)

Despite Demianczyk's assurances that Plaintiff would be able to apply for any director position after she returned from vacation, that was not the case. (Docket No. 92 at ¶¶ 83-85). Some of the director-level positions had already been appointed. (Docket No. 101 at ¶ 98). Plaintiff was, however, able to apply for eight positions. (*Id.* at ¶ 116). All of the positions she applied for had job descriptions. (Docket No. 81-1 at p. 195).

Before she heard back, McIntosh verbally offered her a position as the Print Center Director. (Docket No. 101 at ¶ 117). When Plaintiff asked for more information about the position including the job description, the salary and benefits, and the potential for a bonus, McIntosh responded that he was not certain that she would earn as much as she had been. (Docket No. 101 at ¶¶ 117-18). Despite her inquiring further, no one was able to give her a job description or even an explanation of what the Print Center position would require. (Docket No. 101 at ¶ 120). Plaintiff was concerned because the Print Center position "didn't sound real. It didn't sound right." (*Id.* at ¶ 138). Plaintiff was particularly interested in seeing a job description because the Print Center was under her supervision and she was concerned that she would not have enough work to do. (*Id.* at ¶ 120).

At some point during the reorganization process, it was determined that the Print Center would move from IT to the Supply Chain. (*Id.* at ¶¶ 127-28). Around this same time, there was a meeting to which Plaintiff was not invited concerning transitioning the Print Center between departments. (*Id.* at ¶ 130). When Plaintiff spoke to her supervisor, Szymanski, about the Print Center position, he advised her not to take it. (*Id.* at ¶ 140).

In a June 21, 2014 email, McIntosh asked Demianczyk:

> What are we doing with [Surman]? I am very concerned about this. She has raised allegations about sexual discrimination and then was told by a vendor that she was losing her job. Does Chris [Carmody] want to separate her immediately?

(*Id.* at ¶ 144). Demianczyk responded,

> I am very concerned as well. We agreed to put her under Jeff [Szymanski] as the director of the print center instead of separating immediately as Chris [Carmody] had requested.

(*Id.* at ¶ 145). McIntosh replied, "Do I need to meet with her?" (Docket No. 81-23). Lisa Bonacci responded, on June 22, 2014, "Eric, I can fill you in on *our plan* a little more on Monday." (*Id.*) (emphasis added).

Plaintiff turned down the Print Center position on July 2, 2014, explaining in an email to McIntosh:

> Per our conversation last night, I have decided that the Director of Print Operations, which is moving to Supply Chain in the Finance Division, would not be in my best interest as it cripples my career path in the technology world. Technology is what I studied for and where[ ]I have gained over 18 years of experience in.

(Docket Nos. 81-22; 101 at ¶ 142).

On Thursday, July 24, 2014, Carmody emailed McIntosh and Demianczyk and stated:

> Given the change in direction below, I would like to immediately proceed with our initial plans to execute the contract of Hiedi [sic] Surman. Her position is expendable given the current structure of the Print Center. Can we proceed with her termination on Monday if possible to further contribute to the overall cost containment goals of ISD. . . .

(Docket Nos. 81-24; 101 at ¶ 146). On Friday, July 25, McIntosh responded that they needed to wait to see whether she was being considered for any other Director positions and cautioned that "[i]f we treat her differently, it could cause issues." (Docket No. 101 at ¶ 147). McIntosh further inquired, "Are you ok delaying a few days or a week until we understand if she is a contender for other openings?" (Docket No. 81-24).

On August 7, 2014, Plaintiff asked Demianczyk for her severance paperwork but Demianczyk encouraged her to wait and see whether she would be offered a position under Scott Haas within the UPMC Health Plan. (Docket No. 92 at ¶ 159). Plaintiff applied for eight positions, which were filled by applicants that UPMC claims were better qualified and at least one requisition was cancelled altogether. (Docket No. 92 at ¶ 154). When Plaintiff did not get an offer from the UPMC Health Plan, Demianczyk and Szymanski met with Plaintiff and gave her the severance paperwork and a formal notice of termination. (*Id.* at ¶ 160; Docket No. 101 at ¶ 148).

Plaintiff was unable to interview for Kazi's Team because all of the positions on his team were appointed. (Docket No. 101 at ¶ 98). Before the reorganization, every Director on Kazi's Team was male, and after the reorganization every Director on Kazi's Team was male. (Docket No. 101 at ¶ 100). Some males, like Jim Vellela who had been on Kazi's Team, were terminated pursuant to the reorganization. (Docket No. 92 at ¶ 148). UPMC maintains that Kazi had no say as to who was retained on his team. (*Id.* at ¶ 147). As to Szymanski's team, it dissolved, and Plaintiff was the only Director on his team that was not retained by UPMC.[1] (Docket No. 101 at ¶¶ 69, 72).

---

[1] UPMC maintains that Guy Vollero and Charles Barkey, two of the four Directors who reported to Szymanski, were not moved to Kazi's Team but rather to a different team. (Docket No. 102 at ¶¶ 173-74). Plaintiff challenges these assertions, arguing that UPMC's original intention was to move them to Kazi's Team. (*Id.*)

According to UPMC, decisions surrounding the 2014 Reorganization "[were] not based on performance or seniority" but rather on "organizational needs." (Docket No. 92 at ¶ 121). Employees at UPMC were evaluated and ranked annually using a 9-Box document. (Docket No. 81-14 at pp. 46-47). Employees were ranked vertically based on their potential and horizontally based on their performance review score. (*Id.* at p. 63). Plaintiff's direct supervisor, Szymanski, was responsible for evaluating Plaintiff. (Docket No. 101 at ¶ 53). Szymanski testified that he always gave Plaintiff the highest possible performance ratings. (Docket No. 101 at ¶ 68). As part of the ranking process the senior team would discuss UPMC's employees and review any information they had obtained. (Docket No. 81-14 at p. 58).

For her April 2014 evaluation, Plaintiff was ranked in box 3, the highest possible box. (Docket No. 102-9). On or about May 5, 2014, Plaintiff's 9-box score was moved to box 6, a lower rating. (Docket No. 96 at p. 135; 101 at ¶ 65). Although there is a UPMC memorandum that circulated around the time of the reorganization that referred to a balanced scorecard approach and that included as part of its approach an inquiry into an employee's performance review, UPMC maintains that it was not ultimately used in making selections for Kazi's Team. (Docket No. 101 at ¶ 58).

The 2014 Reorganization resulted in one hundred and twenty-five employees in ISD losing their jobs, nine of whom were directors. (Docket No. 92 at ¶ 124). As part of the reorganization, Carmody reassigned the ITSM work explaining that he had been disappointed in the progress. (Docket No. 94 at ¶ 151). He recalled an incident in 2013 where UPMC was assessed a $2,000,000 fine due to an issue with Adobe software licenses and he believed Plaintiff and Szymanski were responsible for that oversight. (Docket No. 101 at ¶ 154). Plaintiff maintains ensuring license compliance was not part of her job. (Docket No. 81-1 at pp. 114-15).

III.    RELEVANT PROCEDURAL HISTORY

On February 7, 2017, Plaintiff filed a Complaint against UPMC d/b/a University of Pittsburgh Medical Center and UPMC Presbyterian Shadyside (collectively, "UPMC entities") for sex discrimination and retaliation under Title VII and the PHRA.  (Docket No. 1).  The UPMC entities separately filed answers and affirmative defenses on March 31, 2017.  (Docket Nos. 10, 11).  On May 23, 2017, the parties filed a stipulation for dismissal as to UPMC d/b/a University of Pittsburgh Medical Center pursuant to FED. R. CIV. P. 41(a)(1)(A)(ii), which was granted on May 23, 2017.  (Docket Nos. 23, 24).

After discovery closed, UPMC filed a motion for summary judgment, a brief in support thereof, and a concise statement of material facts and supporting exhibits.  (Docket Nos. 73-76). Plaintiff responded with a brief in opposition, a response to UPMC's statement of material facts, and a counter-statement of material facts.  (Docket Nos. 78-81).  Thereafter, UPMC filed a motion to strike Plaintiff's response to its statement of material facts and a brief in support thereof. (Docket Nos. 82-83).  Plaintiff filed a response and a motion for leave to file a revised response to UPMC's statement of undisputed facts.  (Docket Nos. 85-86).  On June 25, 2018, this Court entered an order granting Plaintiff's motion for leave and denying UPMC's motion to strike, as moot. (Docket No. 87).

On June 25, 2018, Plaintiff filed a revised response to UPMC's statement of undisputed material facts.  (Docket No. 88).  On July 13, 2018, UPMC filed a reply to Plaintiff's brief in opposition to its motion for summary judgment, a reply to Plaintiff's revised response to UPMC's statement of undisputed material facts, a response to Plaintiff's counterstatement of material facts, and a supplemental concise statement of material facts.  (Docket Nos. 91-96).  Plaintiff filed a surreply, a response in opposition to UPMC's renewed motion to strike, and a reply to UPMC's

response to her counterstatement of material facts on August 10, 2018.[2]  (Docket Nos. 99-102). Neither party has requested oral argument, making this matter fully briefed and ripe for disposition.[3]

## IV.     LEGAL STANDARD

Summary judgment shall be granted where there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  To withstand summary judgment, an issue of fact in dispute must be both genuine and material, i.e., one upon which a reasonable factfinder could base a verdict for the non-moving party and one which is essential to establishing the claim.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When considering a summary judgment motion, the court may not weigh the evidence or make credibility determinations, but rather is limited to deciding whether there are any disputed issues that are both genuine and material.  *Id.* at 249, 253.

If the moving party carries its burden under Rule 56, the non-movant must identify "specific facts which demonstrate that there exists a genuine issue for trial."  *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations or mere suspicions in attempting to survive summary judgment.  *Williams*

---

[2]     In footnote 1 to UPMC's counter-response to Plaintiff's revised response to UPMC's statement of undisputed material facts, UPMC expresses its desire to renew its motion to strike.  (Docket No. 92 at p. 1).  UPMC improperly raises its "motion" to strike in a footnote.  *See* FED. R. CIV. P. 7(b), 10; LCrR 7.  Accordingly, its "motion" will not be considered.

[3]     Legal arguments not raised and relief that is not specifically sought in the initial motion are generally deemed waived.  *See, e.g.*, *Sproull*, 2010 WL 339858, at *3 ("[T]he reply brief generally cannot be used to expand the issues presented for adjudication beyond those raised in the moving papers."); *Rivers v. Nat'l Ass'n of Letter Carriers*, No. 15–3070 (SRC), 2016 WL 389983, at *2 (D.N.J. Feb. 1, 2016) (citing *Anspach v. City of Phila.*, 503 F.3d 256, 259 (3d Cir. 2007)) ("New arguments in the reply brief are waived."); *E.E.O.C. v. Aldi, Inc.*, No. CIV. A. 06–01210, 2008 WL 859249, at *5 (W.D. Pa. Mar. 28, 2008) ("Because Aldi conceded this element in its opening brief and only challenges it in its reply brief, the Court finds that Aldi waived any challenge to the second prong for purposes of summary judgment."); *Vay v. Huston*, No. CV 14-769, 2016 WL 1408116, at *8 (W.D. Pa. Apr. 11, 2016).

*v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Celotex*, 477 U.S. at 325). The

non-movant must respond "by pointing to sufficient cognizable evidence to create material issues

of fact concerning every element as to which the nonmoving party will bear the burden of proof at

trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998)

(citation omitted).

## V.    DISCUSSION

Defendant seeks summary judgment on Plaintiff's gender discrimination and retaliation

claims. (Docket Nos. 74; 91). Plaintiff naturally opposes. (Docket Nos. 78; 99). The Court will

discuss the sufficiency of the evidence as to each claim and explain why it rejects each of UPMC's

arguments, in turn.

### A.    *Gender Discrimination*

Plaintiff initially alleges that she was subject to gender discrimination. (Docket No. 1).

UPMC concedes for purposes of its motion that Plaintiff can establish that she is a member of a

protected class and that she was qualified to hold her position. (Docket No. 74 at p. 10). UPMC

argues, however, that Plaintiff cannot establish a prima facie case of gender discrimination because

she cannot establish that she experienced an adverse employment action or show circumstances

that give rise to an inference of unlawful discrimination. (*Id.*) Alternatively, UPMC argues that

even if Plaintiff can establish a prima facie case, UPMC articulated a legitimate, nondiscriminatory

reason for its actions against Plaintiff, a large-scale reorganization of ISD. (*Id.* at p. 16).

Title VII's anti-discrimination policy makes it "an unlawful employment practice for an

employer . . . to discriminate against any individual with respect to [her] compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

national origin." 42 U.S.C. § 2000e–2(a)(1). Similarly, the PHRA makes it "an unlawful

discriminatory practice . . . [f]or any employer because of the . . . sex . . . of any individual . . . to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual." 43 PA. STAT. AND CON. STAT. ANN. § 955(a). Title VII and the PHRA are governed by essentially the same legal standard in disparate treatment claims. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 791 n.8 (3d Cir. 2016).

Both parties have agreed that the test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. In this landmark case, the Supreme Court for the United States of America established a three-part burden-shifting framework that applies in cases of gender discrimination where a plaintiff relies on indirect evidence of discrimination. *Id.* Under the first step in the *McDonnell Douglas* analysis, plaintiff has the burden of establishing a prima facie case of discrimination. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). To establish a prima facie case of gender discrimination, the plaintiff must show that: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) those outside the protected class were treated more favorably. *Id.* "[A] plaintiff whose employment position is eliminated in a corporate reorganization or work force reduction carries a heavier burden in supporting charges of discrimination than does an employee discharged for other reasons." *Hook v. Ernst & Young*, 28 F.3d 366, 375 (3d Cir.1 994) (quoting *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 517 (6th Cir. 1991)). If the plaintiff meets this burden, the burden of production then "shifts to the defendant to offer a legitimate non-discriminatory [justification] for the adverse employment action." *Burton*, 707 F.3d at 426 (quoting *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009)) (alteration in original). If the defendant is able to do so, the burden of production shifts back to the plaintiff "to provide evidence from which a

factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Id.*

At the outset, the Court notes that Plaintiff has narrowed her case during summary judgment proceedings and challenges two discrete employment actions, i.e., UPMC's decision to keep her off Kazi's Team and Kazi's refusal to work with her. (Docket No. 78 at p. 5). UPMC responds that being kept off Kazi's Team is a red herring because no one was able to apply for a position on Kazi's Team. (Docket No. 91 at p. 2). Instead, UPMC explains that all Directors who remained on Kazi's Team post-reorganization were retained due to the highly technical nature of the positions. (*Id.*) Additionally, UPMC surmises that Plaintiff sustained an adverse action of her own making when she declined her appointment to become the Print Shop Director. (*Id.* at p. 3). Plaintiff counters that the Print Shop Director position was not really a reasonable offer based on the information that UPMC had provided to her. (Docket No. 99 at pp. 8-9). Although Plaintiff has narrowed the issues, whether or not she sustained an adverse action cannot properly be addressed without considering the entire narrative of facts as this is a reduction in force matter.[4]

The Court of Appeals for the Third Circuit has explained that an adverse employment action is one by an employer "that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Se/ Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). Examples of adverse actions include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

---

[4]      It bears mentioning that there remains a material issue of fact as to whether Surman's position was actually eliminated pursuant to the reduction in force. The reduction in force presumably began in May 2014, and Surman's last day was not until August 2014. (Docket Nos. 92 at ¶ 160; 101 at ¶ 148; 102-7). Moreover, it is unclear what Surman's duties were for UPMC after part of her duties were re-assigned to Paxton-Hughes in May 2014. (Docket Nos. 79 at 180; 92 at ¶¶ 134-38).

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *see Remp v. Alcon Labs.*, 701 F. App'x 103, 107 (3d Cir. 2017).

A lateral transfer to a less desirable position can be an adverse action. *Johnson v. Cmty. Coll. of Allegheny Cty.*, 566 F. Supp. 2d 405, 430 (W.D. Pa. 2008). "[A]ctions that reduce opportunities for promotion or professional growth can constitute adverse employment actions" especially where the move prevents the employee from using her skills and experience. *Walker v. Centocor Ortho Biotech, Inc.*, 558 F. App'x 216, 219 (3d Cir. 2014) (citing inter alia *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)); *see Oguejiofo v. Bank of Tokyo Mitsubishi UFJ Ltd.*, 704 F. App'x 164, 168 (3d Cir. 2017).

It is undisputed that at some point Plaintiff was informed that her position as Director of ETS would be eliminated. *See* (Docket Nos. 92 at ¶ 79; 101 at ¶¶ 14, 79). Although UPMC offered her the Director of the Print Shop position, there is a material question of fact as to whether this "lateral transfer" reduced Plaintiff's opportunities for promotion, professional growth, or would materially alter her pay. (Docket No. 101 at ¶¶ 117-18, 120). She was trained in IT and while as Director of ETS she did some work for the Print Shop, her position entailed a wide-array of duties. (Docket No. 94 at ¶ 6). In fact, Plaintiff believed that the job change would hinder her career as did Szymanski and so Plaintiff respectfully declined the offer. (Docket Nos. 81-22; 101 at ¶¶ 138,140, 142). Plaintiff also challenges the legitimacy of the job offer because she believed that if she accepted it, there would not have been enough work for her to do. (Docket No. 101 at ¶ 120). Relatedly, there is a dispute of material fact as to whether Plaintiff quit or whether she was fired from UPMC. (Docket Nos. 81-22; 92 at ¶ 160; 101 at ¶¶ 142, 148). Thus, a material issue of fact exists as to whether Plaintiff suffered an adverse action.

UPMC opines that Plaintiff also cannot establish the fourth element of a prima facie case because no male Director had ITSM as part of his job function and no male Director who had similar responsibilities was appointed to the same position. (Docket No. 74 at pp. 13-14). UPMC explains that the members of Kazi's Team are not similarly situated because they did different work from Plaintiff. (*Id.* at p. 14). Plaintiff responds that a factfinder could conclude that UPMC's refusal to allow Surman to even apply for a position on Kazi's Team gives rise to an inference of unlawful discrimination considering men were moved to Kazi's Team as part of the reorganization. (Docket No. 78 at pp. 8-9).

While recent unpublished Third Circuit opinions have required a plaintiff to show that similarly situated employees outside of the protected class were retained in a reduction in force case, this Court is bound by Third Circuit precedential decisions, which have established a much lower hurdle.[5] *See Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 203 (3d Cir. 2017). In the precedential decisions, when there is a reduction in force, the fourth element to establish a prima facie case is relaxed. *In re Carnegie Ctr. Assocs.*, 129 F.3d 290, 294-95 (3d Cir. 1997); *see Marzano v. Computer Sci. Corp.*, 91 F.3d 497, 502, 510-11 (3d Cir. 1996) (interpreting New Jersey state law as consistent with federal law and explaining that in a reduction of force case, the fourth prong does not require a plaintiff to demonstrate that similarly situated plaintiffs were retained); *see also Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999). In order to sustain [her] burden, the plaintiff must simply proffer evidence that "persons outside of the

---

[5]     The Third Circuit, as recently as 2017, in *Anderson v. Boeing Co.*, 694 F. App'x 84, 86 (3d Cir. 2017), articulated the fourth prong in a reduction in force as: A prima facie case of discrimination under Title VII and the PHRA in the context of a RIF requires an employee to show: "(4) retention by the employer of similarly situated employees outside of the relevant protected class"; however, the Third Circuit case it cites as authority does not contain the similarly-situated requirement. *Id.* at 86 (citing *In re Carnegie Ctr. Assocs.*, 129 F.3d 290, 294-95 (3d Cir. 1997)).

protected class were retained." *In re Carnegie Ctr. Assocs.*, 129 F.3d at 295. UPMC does not contest that persons outside of the protected class were retained following the reorganization.

The burden now shifts to UPMC to proffer a legitimate, nondiscriminatory reason for its adverse action. An employer's burden is relatively light at this stage. *In re Tribune Media Co.*, __ F.3d __, 2018 WL 4212086, at *12 (3d Cir. Sept. 5, 2018). "If the employer meets this burden, the presumption of intentional discrimination disappears. . . ." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003). The employer need not "prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse employment action. Instead, the employer must provide evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citing *Fuentes*, 32 F.3d at 763).

UPMC explains that in 2014, it underwent a large-scale reorganization and as part of that reorganization, one hundred and twenty-five positions were eliminated, including Plaintiff's; Plaintiff's position was eliminated, in part, because Carmody believed that someone could do aspects of her job better. (Docket No. 74 at pp. 16-17). As to why Plaintiff was not even considered for Kazi's Team, Carmody explained that he

> (1) . . . was unhappy with Szymanski and Plaintiff's direction with ITSM; (2) he assigned ITSM to Ms. Paxton-Hughes because of her abilities and to raise the profile of ITSM; (3) he selected which positions to retain based on his determination of what his division needed; (4) he left Kazi's Team mostly intact because of the highly technical nature of the positions and because he did not have an excess of management employees; (5) Kazi had no input into the 2014 reorganization; and (6) when Ms. Paxton-Hughes left UPMC, Carmody replaced her with another female Director.

(Docket No. 91 at p. 7). Plaintiff asserts that UPMC's proffered legitimate, nondiscriminatory reason is facially invalid because UPMC originally planned to allow everyone to apply for Kazi's Team and then inexplicably changed course despite moving some individuals to Kazi's Team.

(Docket No. 78 at pp. 12-14). Additionally, Plaintiff argues that UPMC should not be allowed to offer any legitimate reason because it went out of its way to use the passive voice in discovery in order to obfuscate who its decision-makers were during the reorganization. (*Id.* at 11.)

Plaintiff's argument goes to pretext. *See Marione v. Metro. Life Ins. Co.*, 188 F. App'x 141, 144 (3d Cir. 2006) (explaining even on summary judgment, defendant needs only to articulate a legitimate, nondiscriminatory reason and it need not be proven to be legitimate at this stage). UPMC has offered a facially legitimate, nondiscriminatory reason for its adverse action, i.e., Plaintiff's position was eliminated pursuant to a reorganization and other people who were purportedly more qualified for the needs of UPMC's ITSM department were retained.

The final stage of the *McDonnell Douglas* test requires "the plaintiff to prove that the employer's reasons for [her] termination were pretextual." *In re Tribune Media Co.*, __ F.3d __, 2018 WL 4212086, at *12. In order to defeat summary judgment, the plaintiff must point to evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons . . . or (2) believe that an invidious discriminatory reason was more likely than not a . . . determinative cause of the employer's action." *Id.* at *12; *Palmer v. Fed. Express Corp.*, 235 F. Supp. 3d 702, 715 (W.D. Pa. 2016). This is known as the *Fuentes* test. "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.

With respect to prong one of the *Fuentes* test, plaintiff must point to evidence indicating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' to satisfy the factfinder that the employer's actions could

not have been for nondiscriminatory reasons." *Willis*, 808 F.3d at 644-45 (quoting *Fuentes*, 32 F.3d at 765).  "The question at prong one of the *Fuentes* test 'is not whether the employer made the best, or even a sound, business decision;' it is whether the real reason for the employment decisions is discrimination." *Bliech v. Johnson & Johnson, Inc.*, 6 F. Supp. 3d 589, 608 (W.D. Pa. 2014) (quoting *Keller v. ORIX Credit Alliance*, 130 F.3d 1101, 1109 (3d Cir. 1997)).

With respect to the second prong, "a plaintiff must provide evidence that allows the factfinder to infer that discrimination was 'the 'but-for' cause of the employer's adverse decision.'" *Anderson v. Mack Trucks, Inc.*, 118 F. Supp. 3d 723, 741 (E.D. Pa. 2015) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

To avoid summary judgment, a plaintiff must rebut each of the employer's proffered legitimate reasons such that a factfinder could reasonably infer that *every* reason was not the actual motivation behind the action.  *Kiesewetter v. Otis Elevator Co.*, 183 F. Supp. 3d 656, 659 (E.D. Pa. 2016).  Where a plaintiff is terminated pursuant to a reduction in force, the plaintiff

> may put forth evidence from which a jury could infer that the employer deviated from its normal policies and procedures for a layoff, or that the performance ratings that contributed to the selection for layoff were not consistent with actual performance, suggesting that they were given in an attempt to ensure that the plaintiff was among those discharged in the [reduction in force].

*Id.* (citing *Tomasso v. Boeing Co.*, 445 F.3d 702, 709 (3d Cir. 2006); *Stewart v. Rutgers State Univ.*, 120 F.3d 426, 434 (3d Cir.1997)).

Plaintiff argues that the first prong is satisfied for a number of reasons, including inter alia, that she was told that she could apply for Kazi's Team but later was not allowed to, yet people were still added to his team; that a 2014 Reorganization document suggested that personnel decisions would be made based on performance ratings but Carmody never actually used them; that Plaintiff's 9-box rating was lowered in preparation for the reorganization; that Kazi was the

only director not to have any input into who would be retained on his team; and that Plaintiff was blamed for the Adobe licensing error when it was not her fault and the man who made the mistake was appointed to Kazi's team as part of the reorganization. (Docket No. 78 at p. 15-18).

In this Court's estimation, there is more than enough evidence from which a rational jury could infer that Plaintiff's gender may have been a determinative factor in UPMC's decision. *See Palmer*, 235 F. Supp. 3d at 715. As to the first *Fuentes* prong, UPMC describes its reorganization strategy as having been a "fluid process", meaning that as time went on, UPMC changed how it was going to decide which positions and people to eliminate. (Docket No. 74 at p. 7). UPMC explained that initially a 9-box score was to be used and department directors were to be consulted in the decision-making process; however, in the end, when it came to Kazi's Team, Carmody was the lone decision-maker and he did not consult the 9-box score. (Docket No. 101 at ¶ 58).

There is additional evidence to suggest that UPMC repeatedly attempted to block Plaintiff from a positon in her chosen career path— and did so by lowering her 9-box rating just prior to the reorganization despite her direct supervisor's high acclaim of her, (Docket Nos. 96 at p. 135; 101 at ¶¶ 65, 68); by telling her she could apply for a position on Kazi's Team and then changing its mind, (Docket Nos. 92 at ¶¶ 83-85; 101 at ¶ 98, 116); changing the composition of Kazi's Team without allowing anyone to apply, (Docket No. 101 at ¶ 98); and offering Plaintiff a position it represented to be a lateral move that was seemingly devoid of any ITSM skills, (Docket No. 101 at ¶¶ 117-18).

When making decisions as to who would remain or be moved to Kazi's Team, there is evidence to suggest that Carmody was aware that at least two women had professed difficulties working with Kazi. (Docket No. 101 at ¶¶ 48, 50). He may also have been aware that Kazi had used the amorphous term "invisible" to describe Plaintiff, (Docket Nos. 81-24; 101 at ¶¶ 82, 146);

a term that has potentially veiled derogatory connotations.[6]  When making his determination to eliminate Plaintiff, Carmody stated that he was unimpressed with Plaintiff's work and blamed her for UPMC's $2 million fine; however, there is a disputed issue of fact as to whether she was actually responsible for that blunder or if it should have been attributed to a male employee Carmody retained  (Docket Nos. 81-1 at pp. 114-15; 94 at ¶ 151; 101 at ¶ 154).

Next, Kazi's Team was all male when he took the team over and it remained all male post-reorganization.  (Docket No. 101 at ¶ 100).  Thus, Plaintiff has advanced sufficient evidence from which a rational jury could infer that UPMC's actions could not have been for nondiscriminatory reasons.  All told, Plaintiff has carried her burden to show a reasonable juror could find that her gender was the determinative factor in her adverse action.

UPMC stresses that Plaintiff's gender could not have been the cause of her adverse action because part of her duties were assigned to another female, Paxton-Hughes, (Docket No. 74 at 17).  However, "even if a woman is fired and replaced by another woman, she may have been treated differently from similarly situated male employees."  *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 353-54 (3d Cir. 1999).

Because Plaintiff has successfully shown that each articulated reason by UPMC could reasonably be disbelieved, Plaintiff has met her burden under the first prong to show pretext and this Court need not analyze Plaintiff's arguments under the second prong.  Accordingly, UPMC's motion for summary judgment as to Plaintiff's gender discrimination claim is denied.

---

[6]        The fact that Kazi described a male as "invisible" does nothing to prove that this statement was not a derogatory insult hurled to emasculate them.  *Dykes v. Marco Group, Inc.*, 222 F. Supp. 3d 418, 428 (E.D. Pa. 2016) (explaining the context of the statement viewed in light of other evidence is important).

B.     *Retaliation*

Plaintiff also brings a retaliation claim.  (Docket No. 1).  In response, UPMC argues that summary judgment is proper because Plaintiff cannot establish a prima facie case of retaliation given that she did not experience an adverse employment action and did not engage in protected activity until after UPMC had already determined that she would no longer hold her position and Carmody had already put into motion Paxton-Hughes' assumption of some of Plaintiff's responsibilities.  (Docket No. 74 at p. 15).  UPMC recycles the same arguments as to legitimate business reasons and pretext that it makes with respect to Plaintiff's gender discrimination claim. (*Id*.).  Plaintiff responds that her job responsibilities were not reassigned until early July 2014 (after she engaged in protected activity) and her complaints to Carmody and Szymanski about Kazi's behavior prior to the reorganization also constitute protected activity.  (Docket No. 78 at p. 19). She asserts UPMC changed its reorganization plans after she complained and points to a series of emails that demonstrates UPMC's retaliatory animus.  (*Id.* at pp. 19-20).  UPMC responds that Plaintiff, by asserting that her complaints to Carmody and Szymanski are protected activities, is setting forth a new timeline, one that she has not argued before.  (Docket No. 91 at p. 8).  Having carefully considered the parties' positions, the Court holds that Plaintiff has adduced sufficient evidence on her retaliation claim.  The Court's rationale follows.

Retaliation claims under the PHRA and Title VII are analyzed using the same standard. *Connelly v. Lane Const. Corp.*, 809 F.3d at 791 n.9.  Title VII's retaliation provision provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Absent direct evidence of retaliation, Title VII retaliation claims are analyzed according to the burden-shifting framework laid out above in *McDonnell Douglas*: (1) first, the plaintiff must establish a prima facie case of retaliation; (2) then, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for the adverse employment action; (3) and finally, the plaintiff is afforded an opportunity to show that the employer's proffered reason was a pretext for retaliation. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006). "Although the burden of production shifts, 'the plaintiff has the ultimate burden of persuasion at all times.'" *Leftwich v. Sec'y U.S. Dept. of Treasury*, __ F. App'x __, 2018 WL 3486789, at *2 (3d Cir. July 19, 2018) (quoting *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)).

To state a prima facie case of retaliation, a plaintiff must establish that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore*, 461 F.3d at 340-41 (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). A plaintiff has less of a causal burden at the prima facie case stage. *Carvalho–Grevious v. Delaware State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017).

For purposes of the first element of a prima facie case, protected activity includes not only formal charges but also "informal protests of discriminatory employment practices, including making complaints to management" which is considered protected activity as long as "it [is] possible to discern from the context of the statement that the employee opposes an unlawful employment practice." *Jajua v. Diakon Lutheran Soc. Ministries*, 299 F. Supp. 3d 645, 656 (E.D. Pa. 2018) (internal citation and quotation omitted). Furthermore, "[a] plaintiff need not prove the merits of the underlying discrimination complaint, but only that 'he was acting under a good faith,

reasonable belief that a violation existed.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) (quoting *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir.1993)).  Here, a reasonable jury could find that Plaintiff engaged in protected activity when she complained to Szymanski and Carmody separately about Kazi and in July 2014, when she discussed Kazi's behavior with Demianczyk and McIntosh. (Docket Nos. 81-4 at p. 3; 101 at ¶ 14).

With regard to the second element, adverse employment action, the plaintiff need not demonstrate a change in the "conditions of employment" rather what is most important is that the act "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Feliciano v. Coca-Cola Refreshments USA, Inc.*, 281 F. Supp. 3d 585, 591 (E.D. Pa. 2017) (quoting *Artz v. Cont'l Cas. Co.*, 720 F. Supp. 2d 706, 714-15 (E.D. Pa. 2010)). However, "petty slights, minor annoyances, and simple lack of good manners" do not rise to the level of an adverse action.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Instead, the question is whether a "reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Id* (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  The Third Circuit has described an adverse employment action "as an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey*, 390 F.3d 760, 764 (3d Cir. 2004)).  As explained above, viewing the facts in a light most favorable to the non-movant, there is a material question of fact as to whether Plaintiff sustained an adverse employment action.

As to the third element of a prima facie case, a causal connection exists if the plaintiff produces evidence "sufficient to raise the inference that her protected activity was the *likely* reason

for the adverse [employment] action." *Carvalho-Grevious*, 851 F.3d at 259 (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)).  The court can consider a "broad array of evidence" including, but not limited to, temporal proximity between the protected activity and the adverse action, inconsistent statements, or a pattern of antagonism. *Id.*; *see Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 221 (3d Cir. 2017).  However, "[a]n inference of 'unduly suggestive' temporal proximity begins to dissipate where there is a gap of three months or more between the protected activity and the adverse action." *Moody*, 870 F.3d at 221.  Causation does not exist where the decision to terminate the plaintiff preceded the protected activity. *Pantoja v. Brennan*, 257 F. Supp. 3d 63, 643 (D. Del. 2017) (citing *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 516 (3d Cir. 2004)).  Courts may consider the cumulative effect of the employer's conduct when determining causation. *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 303 (3d Cir. 2007).

Here, there is sufficient evidence of record from which a reasonable factfinder could conclude that the element of causation is met.  To this end, there are a series of emails between members of UPMC's HR department and Carmody, one of UPMC's decision-makers, that when read in the light most favorable to Plaintiff, suggest that UPMC regularly thought about terminating Plaintiff for her protected activity.  (Docket Nos. 81-23; 81-24; 101 at ¶ 144-47).  One even alludes to a "plan" they had devised to handle Plaintiff's employment at UPMC.  (Docket No. 81-23).  Thus, a reasonable jury could infer that her protected conduct was likely the reason for UPMC's adverse action.

At the second step of the *McDonnell Douglas* test, an employer's burden of production is relatively light and is satisfied by introducing evidence which, taken as true, would permit the conclusion that there was a legitimate, non-retaliatory reason for the unfavorable employment decision. *Fuentes*, 32 F.3d at 763.  UPMC has offered a facially legitimate, nondiscriminatory

reason for its adverse action, i.e., Plaintiff's position was eliminated pursuant to a reorganization and other people who were purportedly more qualified for the needs of UPMC's ITSM department were retained.

As to the third step of *McDonnell Douglas* test, the plaintiff must "demonstrate 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' from which a reasonable juror could conclude that the [d]efendant['s] explanation is 'unworthy of credence, and hence infer that the employer did not act for the asserted [non-retaliatory] reasons.'" *Carvalho–Grevious*, 851 F.3d at 260 (quoting *Daniels*, 776 F.3d at 199). A plaintiff can also do so by pointing to some evidence that:

> (1) 'casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication;' or (2) allows the factfinder to reasonably conclude that 'discrimination was more likely than not a . . . determinative cause of the adverse employment action. . . . A plaintiff can demonstrate the latter by 'showing that the employer in the past had subjected [her] to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of [her] protected class more favorably, or that the employer has discriminated against other members of [her] protected class or other protected categories of persons.'

*Leftwich*, __ F. App'x __, 2018 WL 3486789, at *3 (3d Cir. July 19, 2018) (quoting *Fuentes*, 32 F.3d at 765) (final three alterations in original). "[T]o prove causation at the pretext stage, the plaintiff must show she would not have suffered the adverse action 'but for' her protected activity." *Collins v. Kimberly-Clark Pa. LLC*, 247 F. Supp. 3d 571, 604 (E.D. Pa. 2017).

Viewing the evidence in the light most favorable to Plaintiff, a reasonable factfinder could conclude that UPMC's nondiscriminatory reason was a pretextual cover for retaliation given UPMC's shifting reorganization plan, various HR members discussing via email Carmody's desire to terminate Plaintiff for her protected activity and how her termination could present a legal problem, an email referencing UPMC's "plan" for Plaintiff, and Carmody himself expressing his

desire that Plaintiff be terminated for her complaints. (Docket Nos. 81-23; 81-24; 101 at ¶ 144-47). All told, there is sufficient evidence from which a reasonable factfinder could find that but for Plaintiff's protected activity, Plaintiff would not have sustained an adverse action, *see Collins, 247 F. Supp. 3d at 604*, and from which a reasonable factfinder could disbelieve UPMC's proffered nondiscriminatory reason, *see Fuentes, 32 F.3d at 765*. Accordingly, UPMC's motion for summary judgment as to Plaintiff's retaliation claim is denied.

VI.     CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgement [73] is denied. An appropriate Order follows.


                                                    */s Nora Barry Fischer*
                                                    Nora Barry Fischer
                                                    United States District Judge


Dated: October 9, 2018

cc/ecf: All counsel of record.